972 F.2d 343
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Keith Warren MCCORMICK, Jr., Defendant-Appellant.
 No. 91-5706.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 4, 1992
Decided: August 10, 1992
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. William M. Nickerson, District Judge. (CR-90-334-WN)
 ARGUED: Denise Benvenga, Assistant Federal Public Defender, Federal Public Defender's Office, Baltimore, Maryland, for Appellant.
 Christopher Bowmar Mead, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 ON BRIEF: Fred Warren Bennett, Federal Public Defender, Federal Public Defender's Office, Baltimore, Maryland, for Appellant.
 Richard D. Bennett, United States Attorney, Peter M. Semel, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 Affirmed.
 Before WILKINSON and NIEMEYER, Circuit Judges, and STAMP, United States District Judge for the Northern District of West Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant Keith McCormick appeals his conviction for kidnapping, 18 U.S.C. § 1201, interstate transportation of a stolen vehicle, 18 U.S.C. § 2312, and use of a dangerous weapon during a crime of violence, 18 U.S.C. § 924(c). We affirm the judgment of conviction.
 
 I.
 
 2
 While driving in Maryland on July 22, 1990, Keith McCormick ran his car into the side of another vehicle being driven by Shannon McWeeney, forcing McWeeney's car off the road. McCormick then abandoned his automobile, and while pointing a rifle at McWeeney, McCormick entered her car and ordered her to drive him from Maryland to Augusta, Georgia. He stated that he wanted to kill his brotherin law, who lived in Augusta. McCormick warned McWeeney not to attempt an escape because, in addition to his rifle, he had another gun and a knife hidden on his person.
 
 
 3
 Over the course of the next day, McCormick and his captive made several stops on the way to Georgia. One of these stops was at a hotel in Newington, Virginia. While there, McCormick ordered the victim to remove her clothes. When she refused, he choked her until she lost consciousness. When she regained consciousness, McCormick forcibly performed oral sex on her, forced her to perform oral sex on him, and raped her. At a later stop at a hotel in North Carolina, McCormick again raped her and forced her to perform oral sex on him. After they finally arrived in Augusta, Georgia, McWeeney stopped her car and told McCormick that he could kill her if he wished, but that she was not going any farther with him. McCormick took her credit card and drove away without her.
 
 
 4
 Later that day, McCormick called his pastor, John Harrison, and told him that he had run a young woman off the road in Maryland and forced her to drive him south. McCormick also told Harrison that he had forced the woman to have sex with him. McCormick indicated a desire to turn himself in, but he said he was afraid that he would be hurt if he did so. McCormick then asked Harrison to come to South Carolina to accompany him when he surrendered to law enforcement authorities. McCormick called Harrison again a few hours later to inform him that he was at a hotel in Columbia, South Carolina. Harrison then informed the FBI of McCormick's whereabouts. FBI agents went to the hotel, where they arrested McCormick. At the scene, they found McWeeney's car, her credit card, and a loaded rifle.
 
 
 5
 After a five-day trial, a jury found McCormick guilty of kidnapping, interstate transportation of a stolen vehicle, and use of a dangerous weapon during a crime of violence. McCormick now appeals.
 
 II.
 
 6
 McCormick claims that the admission into evidence of testimony by Pastor Harrison concerning the two phone calls from McCormick violated the clergy-communicant privilege. After conducting a hearing, the district court found that McCormick had called Harrison seeking his assistance in surrendering to law enforcement authorities. The court ruled that the purpose of the phone calls was not to seek spiritual advice or consolation, so the privilege did not apply.* We agree with the district court that this privilege only covers communications designed to elicit spiritual advice or consolation. See Trammel v. United States, 445 U.S. 40, 51 (1980); In re Grand Jury Investigation, 918 F.2d 374, 384 (3d Cir. 1990);U.S. v. Dub# B1# e, 820 F.2d 886, 889 (7th Cir. 1987). After examining the record, we find no basis to conclude that the district court erred in its finding that the communications at issue did not have that purpose.
 
 III.
 
 7
 McCormick also claims that several portions of the prosecutor's closing argument were improper and therefore require reversal for a new trial. Before we examine the specific contentions, we note that this was a heated trial, and the closing arguments reflected the intensity of both sides' effort in the case. Trial counsel must be given leeway in their closing arguments, and it is primarily the responsibility of the district court to indicate when an advocate goes too far. The district court has the benefit of hearing and seeing the arguments in the context of the complete trial. It is in the best position to assess when an argument crosses the line, and appellate courts should be reluctant to overturn a district court's discretion on such matters.
 
 A.
 
 8
 McCormick claims that statements made by the prosecutor during closing argument referring to facts that the defense could not explain amounted to comment upon the defendant's failure to testify. We, however, do not see the prosecutor's statements in that light. The defense in this case argued that McWeeney consented to travel to Georgia with McCormick. In response to this theory, the prosecution highlighted in its closing argument the pieces of evidence that undercut the notion of consent. As a rhetorical part of the argument, the prosecutor noted several times that the defense could not explain how a particular piece of evidence could be reconciled with McWeeney's alleged consent. While it is true that the prosecution may not refer to the failure of a defendant to testify, see Griffin v. California, 380 U.S. 609 (1965), the prosecution's statements in this case do not run afoul of this rule. "The test for determining whether an indirect remark constitutes improper comment on a defendant's failure to testify is: 'Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " United States v. Whitehead, 618 F.2d 523, 527 (4th Cir. 1980) (quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973)). A fair reading of the record reveals the prosecution's comments to be a proper argu ment against the defense theory of consent, not an attempt to focus on McCormick's failure to testify. If we were to rule that Griffin were violated in this case, we would in effect be saying that any reference to weaknesses in a defendant's case may amount to a comment on the failure to testify. We do not believe that Griffin should be extended that far.
 
 B.
 
 9
 McCormick also contends that the prosecutor's reference in his closing argument to a courtroom outburst by McCormick constituted reversible prosecutorial misconduct. During the testimony of McCormick's brother-in-law, McCormick shouted, "Bullshit lies." In the defense's closing argument, defense counsel highlighted testimony from a law enforcement officer that McCormick seemed timid when he was arrested. In rebuttal, the prosecution responded to this argument:
 
 
 10
 Mr. Balter tells you his client when arrested is timid. Of course, the FBI is there with guns. His rifle is in the car. You got a glimpse from Mr. McCormick during this trial, didn't you? Do you remember when Mr. Brigham was testifying? It is a bullshit lie. You got a glimpse of the violence and anger this man is capable of. I suggest to you that Mr. McCormick is right, yes, it is a bullshit lie, but he is referring to the wrong thing. What is a bullshit lie is his suggestion of consent in this case.
 
 
 11
 McCormick now contends that these references to his courtroom outburst constituted an improper attempt to use the outburst as evidence of his bad character.
 
 
 12
 "The test for reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.' " United States v. Brockington, 849 F.2d 872, 875 (4th Cir. 1988) (quoting United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985)). It is clear beyond any doubt that the remarks at issue did not prejudice McCormick. In assessing whether a defendant's rights have been prejudiced by alleged prosecutorial misconduct, we consider four factors:
 
 
 13
 (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.
 
 
 14
 United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983). None of these factors supports a reversal in this case. The remarks in the context of the five-day trial were isolated and non-recurring. Given that they were made in response to a defense argument, we do not believe that the remarks had the tendency to mislead the jury, nor do we believe they were deliberately placed before the jury to divert attention from the main issues of the case. Further, the remarks in question pertained to a matter of which the jury was already aware. Most importantly, the strength of the evidence supporting McCormick's guilt was overwhelming, such that these remarks can only be regarded as of inconsequential effect. Thus, we find no prejudice stemming from the remarks, so a new trial on this basis is unwarranted.
 
 C.
 
 15
 McCormick also suggests that the prosecutor's closing argument contained improper attacks on defense counsel and the defense's tactics. According to McCormick, these attacks amount to reversible error. We again disagree. Most of the statements noted by McCormick are nothing more than strong arguments against the defense's case. The district court properly sustained defense counsel's objections when the prosecution implied that vigorous crossexamination of the victim was improper, and we believe the district court's action was sufficient to cure any error. During rebuttal, the prosecution made personal references to defense counsel in explaining why McWeeney's response to her traumatic situation should not be criticized. The district court overruled the defense objection to these statements, indicating that they constituted a permissible argument. While we believe that district courts should be careful to ensure that closing arguments do not degenerate into ad hominem attacks between counsel, we see nothing in the closing arguments to disturb our view that justice was done in this case. Whatever unfortunate tensions may have characterized the relationship of counsel would not justify overturning a verdict so abundantly supported by the evidence.
 
 IV.
 
 16
 Defendant's remaining assignments of error are without merit. We affirm the judgment of the district court in all respects.
 
 AFFIRMED
 
 
 *
 The district court did rule that statements of remorse made by McCormick during the conversations were covered by the privilege